IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

SEFU AND AZABASHA UHURU,            )
                                    )
        Plaintiffs,                 )
                                    )
vs.                                 )          No. 08-2150-V
                                    )
                                    )
CITY OF MEMPHIS; MICHAEL MCCORD,)
individually and in his official)
capacity as a Memphis Police        )
Department Officer; STEVEN          )
GRISBY, individually and in his )
official capacity as a Memphis      )
Police Department officer; and      )
WILLIAM GRAY, individually and  )
in his official capacity as a       )
Memphis Police Department           )
Officer,                            )
                                    )
        Defendants.                 )

---

ORDER GRANTING DEFENDANT CITY OF MEMPHIS' MOTION FOR SUMMARY
JUDGMENT

---

This is a civil rights action pursuant to 42 U.S.C. § 1983

alleging deprivation of constitutional rights.  In their complaint,

the plaintiffs, Sefu and Azabasha Uhuru (the "Uhurus"), allege that

the City of Memphis (the "City")[1], violated their Fourth Amendment

---

[1]   Although the Uhurus named Director Larry Godwin as a
defendant in their complaint and asserted claims against him in his
personal capacity, the court has dismissed all of these claims.
(Doc. No. 32, Order Granting in Part Defendants' Rule 12(b)(6) Mot.
to Dismiss at 34-35.)  The court therefore takes all the Uhurus'
remaining allegations against Director Godwin acting in his
official capacity as allegations against the City of Memphis and,
to avoid confusion, will refer to them as such.

rights[2] as a result of an alleged unlawful seizure of their persons and the use of excessive force by Officer Billy Gray, Officer Steven Grigsby, and Lt. Michael McCord of the Memphis Police Department ("MPD"). The Uhurus further allege that the City caused the constitutional violation by failing to adequately "screen applicants, train, supervise, investigate, and discipline."[3] (Def. City of Memphis' Mem. in Supp. of Its Mot. For Sum. J. at 1.) The parties have consented to the jurisdiction of the United States Magistrate Court.

Now before the court is the motion for summary judgment of the City. The City moves for summary judgment as a matter of law on all the claims against it on the grounds that the Uhurus have no evidence to prove the allegations against the City. The Uhurus filed a response in opposition to the motion, and the City filed a reply. For the reasons stated below, the City's motion is granted.

## I.  THE ALLEGATIONS IN THE COMPLAINT

The complaint alleges that on May 30, 2007, Officers Gray and

---

[2]  Although the Uhurus alleged in their complaint that the City violated their rights under the Eighth and Fourteenth Amendments, the court found that the complaint failed to stated a claim under the Eighth and Fourteenth but sufficiently stated a claim under the Fourth Amendment. (Doc. No. 32, Order Granting in Part Defendants' Rule 12(b)(6) Mot. to Dismiss at 14-15.) Thus, only the Fourth Amendment claim remains at issue in the case. (*Id.* at 34-35.)

[3]  The court finds no allegations in the Uhurus' complaint of failure to supervise but the City in its memorandum in support of summary judgment asserts failure to supervise as one of the Uhurus' claims.

Grigsby arrived at the Uhurus' beauty salon in Memphis, Tennessee where they were verbally and physically abusive to two men waiting to go with the Uhurus to a play rehearsal. (Compl. ¶¶ 8-12.) It further alleges that after Mr. Uhuru tried to explain the situation, Officer Grigsby attacked him from behind, with Officer Gray later joining in, and that Officer Gray pepper-sprayed the Uhurus, punched them, and ripped out fourteen braids of Mrs. Uhuru's hair. (Compl. ¶¶ 14, 15, 17-19.) According to the complaint, when Lt. McCord arrived on the scene, he purportedly began to use racial slurs and threats and ordered the Uhurus be arrested. (Compl. ¶¶ 20-21.) The complaint further states that the Uhurus were detained in the backseat of a squad car for approximately two and one half hours, that Mr. Uhuru was transported to the Shelby County Jail, booked and processed, and Mrs. Uhuru was transported to Jail East, then to a medical facility, released, and cited for a misdemeanor. (Compl. ¶¶ 21-23.) The Uhurus' complaint states that any and all criminal charges against them have been dismissed. (Compl. ¶ 26.)

The Uhurus' complaint further alleges that Lt. McCord, Officer Gray, and Officer Grigsby are part of a "strike force" ("Strike Team") within the MPD that regularly targets African-American citizens based solely on their race. (Compl. ¶ 27.) It also alleges that the City failed to adequately screen, train, and investigate and discipline officers such as Lt. McCord, Officer

Grigsby, and Officer Gray.  (Compl. ¶¶ 29-31, 41, 46.)  The Uhurus
claim that they sustained significant physical and mental anguish,
pain, and suffering, and they seek both compensatory and punitive
damages.

## II.  UNDISPUTED FACTS

For the purposes of the instant motion, the court finds that
the following facts are undisputed.

The Strike Team was a Uniform Patrol team in the Memphis
Police Department, which engaged in routine patrol in high-crime
areas in Memphis and looked for suspicious behavior.  (Doc. No. 44-
3, Def.'s Undisputed Facts ¶ 1; Doc. No. 44-2, Def.'s Sum. J. Mem.
at 2; Doc. No. 53, Pls.' Resp. to Def.'s Undisputed Facts ¶ 1.)
Unlike the regular Uniform Patrol, the Strike Team did not have to
respond to calls for service.  (Def.'s Undisputed Facts ¶ 2; Pls.'
Resp. to Def.'s Undisputed Facts ¶ 2.)

The MPD's deputy chiefs, deputy director, and director were in
charge of forming the Strike Team.  (Def.'s Undisputed Facts ¶ 6,
fn. 2; Pls.' Resp. to Def.'s Undisputed Facts ¶ 6.)  In seeking
members of the Strike Team, the command staff asked precinct
investigators to select officers they thought would be productive,
hardworking and good for the team.  (Def.'s Undisputed Facts ¶ 3;
Pls.' Resp. to Def.'s Undisputed Facts ¶ 3.)  The command officers
asked the precinct inspectors not to submit officers merely because
of their status as junior officers or officers that were not

4

working at the precincts.  (Def.'s Undisputed Facts ¶ 3 & Ex. H ¶ 17; Pls.' Resp. to Def.'s Undisputed Facts ¶ 4.)  At least one of the police chiefs in charge of recruiting Strike Team members from his district testified that he was asked not to recommend anyone for the Strike Team that had a lengthy disciplinary history. (Def.'s Undisputed Facts ¶ 5; Pls.' Resp. to Def.'s Undisputed Facts ¶ 5.)  The command staff considered various factors in making its selection of officers for the Strike Team, including: the precinct commanders' recommendations, the officer's interest in joining the Strike Team, the length of the officer's service with the MPD, the disciplinary history of the officer, whether the officer was already working in other "critical areas," the availability of the officers, the objectives of the Strike Team, and diversity and uniqueness in the Strike Team.[4]  (Def.'s Undisputed Facts ¶ 6; Pls.' Resp. to Def.'s Undisputed Facts ¶ 6.)

In selecting lieutenants for the Strike Team, the command staff intended to designate one lieutenant from each district and sought recommendations from the precinct inspectors for a good lieutenant for the Strike Team.  (Def.'s Undisputed Facts ¶ 7; Pls.' Resp. to Def.'s Undisputed Facts ¶ 7.)  The command staff

---

[4]     The Uhurus dispute this factual allegation and in support of their position rely on Chief Pilot's testimony that she relied upon recommendations from the precinct inspectors, did not look at each officer's individual history before selecting them, and did not interview the applicants before selection.  The court finds that Chief Pilot's testimony does not contradict this fact, and accordingly treats this fact as undisputed.

took diversity into account when selecting lieutenants and selected one from each district.[5] (Def.'s Undisputed Facts ¶ 8; Pls.' Resp. to Def.'s Undisputed Facts ¶ 8.) Two lieutenants, Michael McCord and Marcus Worthy, were chosen to supervise the Strike Team. (Def.'s Undisputed Facts ¶ 9; Pls.' Resp. to Def.'s Undisputed Facts ¶ 9.) Two deputy chiefs of uniform patrol, Michael Smith and Janice Pilot, supervised the lieutenants and the Strike Team. (Def.'s Undisputed Facts ¶ 10; Pls.' Resp. to Def.'s Undisputed Facts ¶ 10.)

The Uhurus have no knowledge of how the MPD screens applicants to become police officers. (Def.'s Undisputed Facts ¶ 11; Pls.' Resp. to Def.'s Undisputed Facts ¶ 11.) Plaintiff Sefu Uhuru does not know how Lt. McCord, Officer Grigsby and Officer Gray were trained, and Plaintiff Azabasha Uhuru assumes that the City trains its police officers on the proper use of force. (Def.'s Undisputed Facts ¶¶ 12-13; Pls.' Resp. to Def.'s Undisputed Facts ¶¶ 12-13.)

The Tennessee Peace Officers Standards and Training Commission ("POST") provides employment and minimal training standards for police officers in the State of Tennessee. (Def.'s Undisputed Facts ¶ 14; Pls.' Resp. to Def.'s Undisputed Facts ¶ 14.) The MPD

---

[5]     The Uhurus also dispute this factual allegation and rely on Chief Pilot's testimony that the executive team was not looking for anything specific in the applicants for the Strike Team. The court finds that the portion of Pilot's deposition which the Uhurus cite in favor of this proposition does not apply to this statement. Accordingly, the court treats this fact as undisputed.

requires its full-time commissioned law enforcement officers to meet POST pre-employment requirements and the minimum basic police training requirements. (Def.'s Undisputed Facts ¶ 15; Pls.' Resp. to Def.'s Undisputed Facts ¶ 15.)

The MPD requires applicants for the position of police officer to successfully complete five tests. (Def.'s Undisputed Facts ¶ 16; Pls.' Resp. to Def.'s Undisputed Facts ¶ 16.) The MPD makes job offers only to those applicants who successfully pass the first three tests, and these offers are contingent upon the applicants passing two remaining tests: (1) a psychological test; and (2) a comprehensive medical examination. (Def.'s Undisputed Facts ¶ 16; Pls.' Resp. to Def.'s Undisputed Facts ¶ 16.) One of the first three tests includes a background investigation consisting of a driving history review, criminal history review, and verification of personal and employment references. (Def.'s Undisputed Facts ¶ 16; Pls.' Resp. to Def.'s Undisputed Facts ¶ 16.)

Lt. McCord and Officers Gray and Grigsby met all applicable standards for being commissioned as law enforcement officers, including passing the background investigation and psychological test. (Def.'s Undisputed Facts ¶ 17; Pls.' Resp. to Def.'s Undisputed Facts ¶ 17.)

Currently, POST requires at least 400 hours of instruction and study for a Basic Police Course, which POST must approve before it is conducted. (Def.'s Undisputed Facts ¶ 18; Pls.' Resp. to Def.'s

Undisputed Facts ¶ 18.)   Each year, all full-time commissioned certified police officers are required to participate in POST approved forty (40) hours in-service training. (Def.'s Undisputed Facts ¶ 18; Pls.' Resp. to Def.'s Undisputed Facts ¶ 18.)

For their Basic Police Course, MPD police officers receive more than the POST minimum hours. (Def.'s Undisputed Facts ¶ 19; Pls.' Resp. to Def.'s Undisputed Facts ¶ 19.)   In total, Lt. McCord received 800 hours of initial training, and Officers Gray and Grigsby each received 840 hours of initial training. (Def.'s Undisputed Facts ¶ 20; Pls.' Resp. to Def.'s Undisputed Facts ¶ 20.)

Basic police recruit training provides courses on various subjects including constitutional law, search and seizure, civil liability, use of force, proper arrest procedures, and basic life support training. (Def.'s Undisputed Facts ¶ 21; Pls.' Resp. to Def.'s Undisputed Facts ¶ 21.)   It also includes a six-hour course on interpersonal relations which teaches conflict resolution, including controlling emotions such as anger and aggression when evaluating and responding to situations. Def.'s Undisputed Facts ¶ 22; Pls.' Resp. to Def.'s Undisputed Facts ¶ 22.)

In addition to basic recruiting training courses, Lt. McCord also completed other specialized courses, including a thirty-two-hour course in field training officer development in 1996 and an eight-hour course in executive command leadership in 2003. (Def.'s

Undisputed Facts ¶ 23; Pls.' Resp. to Def.'s Undisputed Facts ¶ 23.)  Both Officers Gray and Grigsby also completed, in October 2006 and October 2005, respectively, a specialized course in crisis intervention team training which deals with conflict resolution as well as crisis intervention while dealing with people with mental concerns and provides training regarding how to handle crisis situations.  (Def.'s Undisputed Facts ¶¶ 24-26; Pls.' Resp. to Def.'s Undisputed Facts ¶¶ 24-26.)

All police officers receive training on the MPD's policy and procedures.  (Def.'s Undisputed Facts ¶ 27; Pls.' Resp. to Def.'s Undisputed Facts ¶ 27.)  The officers selected for the Strike Team did not receive any training in addition to the training the uniform patrol officers receive.  (Def.'s Undisputed Facts ¶ 28; Pls.' Resp. to Def.'s Undisputed Facts ¶ 28.)

The MPD expects its officers to comply with the rules of conduct stated in the policy manual, and officers can be investigated and disciplined for violating the MPD's policies, rules, regulations, and directives.  (Def.'s Undisputed Facts ¶¶ 28-29; Pls.' Resp. to Def.'s Undisputed Facts ¶¶ 28-29.)  The MPD has policies which prohibit the use of excessive force.  (Def.'s Undisputed Facts ¶ 30; Pls.' Resp. to Def.'s Undisputed Facts ¶ 30.)  Sefu Uhuru admitted that the City has a policy as to the appropriate amount of force officers should use when engaged in policing activities.  (Def.'s Undisputed Facts ¶ 31; Pls.' Resp. to

Def.'s Undisputed Facts ¶ 31.)   The MPD enforces its policies prohibiting excessive force and disciplines any officers found to have violated these policies. (Def.'s Undisputed Facts ¶ 31; Pls.' Resp. to Def.'s Undisputed Facts ¶ 32.)

Sefu Uhuru knows the City has a policy regarding the filing of complaints about police officers. (Def.'s Undisputed Facts ¶ 31; Pls.' Resp. to Def.'s Undisputed Facts ¶ 32.) Sefu Uhuru does not know what investigative procedures or disciplinary rules the MPD applies to officers. (Def.'s Undisputed Facts ¶ 31; Pls.' Resp. to Def.'s Undisputed Facts ¶ 32.) Sefu Uhuru does not know of a MPD policy not to investigate and, if warranted, discipline officers whose conduct is called into question. (Def.'s Undisputed Facts ¶ 31; Pls.' Resp. to Def.'s Undisputed Facts ¶ 32.)

The MPD has a system for receiving and responding to citizen complaints of misconduct and excessive force on the part of the police. (Def.'s Undisputed Facts ¶ 36; Pls.' Resp. to Def.'s Undisputed Facts ¶ 36.) The Inspectional Services Bureau ("ISB") receives and investigates citizen complaints about the behavior of MPD officers. (Def.'s Undisputed Facts ¶ 37; Pls.' Resp. to Def.'s Undisputed Facts ¶ 37.) If the ISB finds that police officers have violated MPD policies, it drafts charges against those officers and refers the matter to the Police Administration for discipline. (Def.'s Undisputed Facts ¶ 38; Pls.' Resp. to Def.'s Undisputed Facts ¶ 38.)

The ISB investigated the incident at issue in the instant case. (Def.'s Undisputed Facts ¶ 39; Pls.' Resp. to Def.'s Undisputed Facts ¶ 39.) Sefu Uhuru stated that he felt that the lead investigator for the ISB on the Uhurus' complaints, Sgt. Sharon Mabon, was interested in those complaints and did her best to investigate them. (Def.'s Undisputed Facts ¶ 40; Pls.' Resp. to Def.'s Undisputed Facts ¶ 40.) In its investigation of those complaints, the ISB took statements from approximately twenty-one individuals and collected many documents. (Def.'s Undisputed Facts ¶ 41; Pls.' Resp. to Def.'s Undisputed Facts ¶ 41.)

After its investigation, the ISB sustained several of these allegations. (Def.'s Undisputed Facts ¶¶ 42-43; Pls.' Resp. to Def.'s Undisputed Facts ¶¶ 42-43.) Specifically, with regard to Officers Gray and Grigsby, the ISB sustained the allegations regarding excessive force/abuse, DR-301; truthfulness, DR-108; and two counts of compliance with regulations regarding transporting and radio procedures, DR-101.[6] (Def.'s Undisputed Facts ¶¶ 43-44; Pls.' Resp. to Def.'s Undisputed Facts ¶¶ 43-44.) With regard to Lt. McCord, the ISB sustained the allegations regarding personal conduct, DR-120; compliance with regulations regarding radio procedures, DR-104; and neglect of duty, DR-120. (Def.'s Undisputed Facts ¶ 43; Pls.' Resp. to Def.'s Undisputed Facts ¶

---

[6]   The allegations involving compliance with regulations regarding radio procedures, DR-104, were also sustained against Mark Bush and Nathan Newman, who are not parties to this action.

43.)   Based on these findings, the ISB drafted statements of charges against the officers. (Def.'s Undisputed Facts ¶ 44; Pls.' Resp. to Def.'s Undisputed Facts ¶ 44.)

The City held an administrative hearing on the ISB's Statements of Charges. (Def.'s Undisputed Facts ¶ 45; Pls.' Resp. to Def.'s Undisputed Facts ¶ 45.)   The City sustained charges of neglect of duty and compliance with regulations regarding radio procedures against Lt. McCord and he received a thirty-day suspension   and ten-day suspension based on those charges, respectively. (Def.'s Undisputed Facts ¶ 46; Pls.' Resp. to Def.'s Undisputed Facts ¶ 46.)   The allegation of DR-104 Personal Conduct against Lt. McCord was dismissed. (*Id*.)   Lt. McCord received the discipline which the hearing officers ordered. (Def.'s Undisputed Facts ¶ 50; Pls.' Resp. to Def.'s Undisputed Facts ¶ 50.)

The allegations of excessive force and abuse were sustained against Officers Gray and Grigsby and they received both a one-day suspension and 16 hours of remedial training based on this finding. (Def.'s Undisputed Facts ¶ 47; Pls.' Resp. to Def.'s Undisputed Facts ¶ 47.)   The City also sustained the allegations involving compliance with regulations regarding transportation and compliance with regulations regarding radio procedures against Officers Gray and Grigsby, for which they received written reprimands. (Def.'s Undisputed Facts ¶ 47; Pls.' Resp. to Def.'s Undisputed Facts ¶ 47.)   The allegations regarding truthfulness against Officers Gray

12

and Grigsby were dismissed.  (Def.'s Undisputed Facts ¶ 47; Pls.' Resp. to Def.'s Undisputed Facts ¶ 47.)  Officers Gray and Grigsby also received remedial training in various areas, including verbal judo, conflict resolution/de-escalation, patdown/search, detention/arrest, personal conduct/intimidation, counseling intervention, and deadly force/force continuum.  (Def.'s Undisputed Facts ¶ 48; Pls.' Resp. to Def.'s Undisputed Facts ¶ 48.)  Because both Officers Gray and Grigsby filed grievances, the discipline against them is still pending. (Def.'s Undisputed Facts ¶ 49; Pls.' Resp. to Def.'s Undisputed Facts ¶ 49.)

The City is unaware of any complaints alleging excessive force, DR-301, on the part of Lt. McCord or Officer Grigsby within the five years preceding the underlying incident.  (Def.'s Undisputed Facts ¶ 51; Pls.' Resp. to Def.'s Undisputed Facts ¶ 51.)  The City is aware of one unsustained complaint of excessive force (DR-301) on the part of Officer Gray which allegedly occurred on January 20, 2005.  (Def.'s Undisputed Facts ¶ 52; Pls.' Resp. to Def.'s Undisputed Facts ¶ 52.)  The ISB had not received any complaints of excessive force (DR-301) against a member of the Strike Team while the officer was on the Strike Team as of May 30, 2007.  (Def.'s Undisputed Facts ¶ 53; Pls.' Resp. to Def.'s Undisputed Facts ¶ 53.)

III.   ANALYSIS

A.   <u>Summary Judgment Standard</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact at issue in the case. *LaPointe,* 8 F.3d at 378.   This may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

In response, the nonmoving party must go beyond the pleadings and present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *see also LaPointe*, 8 F.3d at 378.   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an

14

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247—48 (1986)(emphasis in original); *LaPointe*, 8 F.3d at 378.

In deciding a motion for summary judgment, "this [c]ourt must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251—52). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Patton*, 8 F.3d at 346; *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). However, to defeat a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252; *LaPointe*, 8 F.3d at 378. Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Anderson*, 477 U.S. at 255; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

15

B.   <u>Section 1983 Claims Against a Municipality</u>

The Uhurus' complaint alleges that the City encouraged, tolerated, and ratified an official pattern, custom, and practice of failing to adequately screen, train, investigate, and discipline officers of the MPD which "amounts to deliberate indifference to the Constitutional rights of the Plaintiffs." (Compl. ¶¶ 41-43, 46-48.)  Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. §1983 (2006).  Thus, in order to determine whether a municipality is liable under §1983, the court must first determine whether the plaintiffs have been deprived of a right arising under federal law or the Constitution.  *Powers v. Hamilton County Public Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).  Next, the court must determine whether the municipality caused the deprivation of that right while acting under color of state law.  *Id*.

A municipality may not be liable for the torts of its employees under the theory of *respondeat superior*.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  A municipality will only be liable for a deprivation of plaintiffs' rights where the plaintiffs establish that the municipality had a "policy or custom"

16

which caused the deprivation. *Id*. Such policy or custom must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Id*. Plaintiffs may establish the existence of such policy or custom by demonstrating that policymaking officials knew of, and acquiesced to, the practice which caused the injuries. *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 989, 902 (6th Cir. 2004).

The court has previously found that the Uhurus have sufficiently asserted that the City deprived them of the Fourth Amendment's protection against unreasonable searches and seizures pursuant to ¶ 1983. (Doc. No. 32, Order Granting in Part Defendants' Rule 12(b)(6) Mot. to Dismiss at 34–35.) In their motion for summary judgment, the City does not challenge the Uhurus' assertion that the officers used excessive force and unlawfully seized them in violation of their Fourth Amendment rights.[7] Rather, the City maintains that, even assuming the excessive force and unlawful seizure as true, the City did not cause the violation of the Uhurus' rights. Accordingly, the court must determine whether the Uhurus' have set forth enough evidence for a jury to determine that the City had a custom or policy with

---

[7] In its reply, however, the City insists that the Uhurus abandoned their claim of excessive force and the City also challenges whether the alleged four-hour detention of the Uhurus amounts to a violation of the Fourth Amendment's proscription against unreasonable seizures.

17

the force of law which caused the deprivation of the Uhurus' Fourth Amendment rights.

The Uhurus claim that the City's practice of failing to ensure that officers of the MPD were adequately screened, trained, supervised, investigated, and disciplined caused their injuries. In order to succeed under a theory of "inaction" under § 1983, the Uhurus must show:

(1)   a clear and persistent pattern of failure to adequately screen, train, supervise, investigate, and discipline applicants and officers of the MPD;

(2)   either actual or constructive notice on the part of the City of the lack of adequate screening, training, supervision, investigation, and discipline of Memphis police officers;

(3)   that the City's failure to act to correct the screening, training, supervision, investigation, and discipline amounts to deliberate indifference to the rights of the individuals within the City; and

(4)   that the City's failure to screen, train, supervise, investigate, and discipline officers was the direct cause of the deprivation of the Uhurus' constitutional rights.

*Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996).

1.   <u>Failure to Screen</u>

The Uhurus claim that the City's failure to adequately screen the Officers at the time they applied to the MPD and at the time of their selection to the Strike Force amounts to deliberate indifference which caused their injuries. A failure to sufficiently screen an applicant's background may constitute deliberate indifference "only where adequate scrutiny of an

18

applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 411 (1997).  In other words, the plaintiff must establish that the background of the particular officer who caused the injury establishes that he was "*highly* likely to inflict the particular injury suffered by the plaintiff."  *Id.* at 412.

There is no dispute concerning the backgrounds of the officers involved in the underlying incident at the time of their application to the MPD.  The Uhurus do not dispute the City's assertions that all the officers involved in the underlying incident successfully completed background investigations prior to receiving a job offer and that the officers subsequently passed a psychological test and a comprehensive medical examination during their employment.  There is no evidence that the MPD found any information during the application processes of the relevant officers that would have provided any grounds for believing the officers would deprive the City's inhabitants of any federally protected right.  It is therefore undisputed that the City adequately screened the officers when they initially applied for the MPD.

The Uhurus also argue, however, that the City failed to adequately screen Lt. McCord and Officers Gray and Grigsby prior to

their selection for the Strike Team, which occurred after they were already officers.  In support of this argument, the Uhurus rely on the following facts: Officer Grigsby had four complaints on his record regarding failure to adhere to transport requirements; one of the complaints involved both Officers Gray and Grigsby, regarding failure to transport prisoners for three hours on February 15, 2007; Officer Gray stated during the investigation into the February 15, 2007 incident that it was common practice for the Strike Team to change locations; another complaint was also filed based on an incident on March 21, 2007, wherein it was alleged that Officer Gray failed to transport prisoners for two and a half hours after a traffic stop; Lt. McCord was issued a written reprimand in 1995 for an incident where in he used profanity and detained an African American woman and her child in his squad car and did not let the child out after learning he had asthma and was hot; Chief Pilot testified that she did not review the individual histories of applicants for the Strike Team nor interview them; and Chief Pilot was aware there had been other complaints filed against the individuals selected for the Strike Team.

The City has produced undisputed evidence that its screening process for selection of Strike Team members involved consideration of the recommendations of precinct commanders, the officer's interest in serving on the Strike Team, the length of the officer's service with the MPD, the disciplinary history of the officer,

whether the officer already worked in other critical areas, availability of officers, the need to accomplish the objectives of the Strike Team, and diversity and uniqueness in the makeup of the Strike Team. The Uhurus have not come forward with any evidence that the officers on the Strike Team performed duties that necessitated a higher screening process than that which the officers had already successfully completed in the hiring process for the MPD. If additional screening of Strike Team officers was necessary, however, the undisputed evidence shows that the City had a policy in place for additional screening of applicants for the Strike Team.

The majority of the complaints relied on by the Uhurus in support of their argument that the City failed to adequately screen Strike Teams applicants involved incidents which occurred after the officers involved in the underlying incident had been selected for the Strike Team. The Strike Team was formed on August 19, 2006. As such, incidents occurring after the selection of officers for the Strike Team are irrelevant to the Uhurus' failure to screen allegations.

With regard to incidents that occurred prior to the selection of the officers for the Strike Team, the only evidence the Uhurus have produced against Lt. McCord is a 1995 complaint for which he received a written reprimand. It arose out of an incident where Lt. McCord detained an African American woman and her child without

21

explanation, used profanity, and left the child in his squad car with his mother despite complaints that the child was hot and had asthma.   In the instant case, the Uhurus allege that Lt. McCord used racial slurs, used one profane word, and detained the Uhurus in a squad car for two and a half hours after arresting them. Viewing the facts in the light most favorable to the Uhurus, this one incident some twelve years prior is not sufficient evidence upon which  a reasonable jury could find that Lt. McCord was highly likely to commit the acts alleged in the present complaint.

The Uhurus also argue that Chief Pilot's failure to look at each individual's disciplinary history is sufficient to amount to deliberate indifference on the part of the City in screening applicants for the Strike Team.  Although Chief Pilot did state at her deposition that she did not look at each person's disciplinary history in the process of selecting members of the Strike Team, she also expressly stated that she could only speak for herself as to that issue.  The City has presented sworn testimony from Michael Smith stating that one of his considerations in selecting the Strike Team was whether the applicants had an extensive discipline issue and has represented to the court that such histories were considered by others in command in making the Strike Team selections.  The failure of one member of the selection team to consider the discipline histories of applicants for the Strike Team is not sufficient to show that the City was deliberately

indifferent in screening applicants.

Thus, the Uhurus have failed to come forward with sufficient evidence to sustain their allegations regarding failure to adequately screen.  Accordingly, the City's motion for summary judgment on the Uhurus' claim for violation of the Fourth Amendment based on failure to screen is granted.

    2.  <u>Failure to Train</u>

The Uhurus also assert that the City's failure to adequately train the officers involved in the underlying incident caused the deprivation of their constitutional rights.  In order to succeed under a lack of training theory, the plaintiff must prove that (1) the municipality's training program inadequately prepares the officers for the tasks they must perform; (2) that the deliberate indifference of the municipality is the direct cause of the training program's inadequacy; and (3) the inadequacy of the training program caused  or is "closely related to" the plaintiff's injuries. *Berry v. City of Detroit*, 25 F.3d 1342, 1347 (6th Cir. 1994).  To establish that inadequate training amounts to deliberate indifference on the part of the municipality, the plaintiff "must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).

23

The undisputed facts of this case demonstrate that the City adequately trained the officers involved in the underlying incident for the tasks they were to perform as members of the Strike Team. The parties agree that all the officers at issue received training in excess of the minimal initial training, that the MPD provided courses on relevant topics such as constitutional law, search and seizure, civil liability, use of force, proper arrest procedures, basic life support training, and interpersonal relations involving controlling emotions such as anger and aggression and conflict resolution. Additionally, it is undisputed that Lt. McCord took additional courses in field training officer development and executive command leadership and that Officers Gray and Grigsby completed a course in crisis intervention team training dealing with conflict resolution and crisis intervention. Although it is also undisputed that the officers did not receive any additional training before joining the Strike Team, the Uhurus have failed to come forward with any evidence to establish that the members of the Strike Team performed any tasks that required such additional training.

In support of their argument that the City had knowledge of the fact that MPD officers would delay transporting arrested citizens, the Uhurus cite to the fact that Officer Gray had four previous complaints regarding failure to transport requirements; that both Officers Gray and Grigsby were found to have violated MPD

regulations for failing to transport prisoners for three hours on February 15, 2007; that Officer Gray stated that it was common practice for the Strike Team to change positions during the investigation of the February 15, 2007 violation; and that one complaint alleged that Officer Gray had failed to transport individuals for two and one-half hours after the initial traffic stop.

All of the complaints upon which the plaintiffs rely involved transportation issues and not the use of excessive force. Thus, the Uhurus have come forth with no evidence of prior incidents of excessive force sufficient to put the City on notice that training in this area was deficient.

Of the four complaints against Officer Gray, two involved delay in transporting prisoners: one on February 15, 2007 involving a three-hour delay and the other on March 21, 2007 involving a two-and-one-half-hour delay. Both Officers Gray and Grigsby were found in violation of department regulations on transporting prisoners for the February 15, 2007 incident. The March 21, 2007 complaint was dismissed. During the investigation of the February 15, 2007 incident, Officer Grigsby stated "that as far as holding defendants in the squad car, this was a common practice citywide . . . [w]hen using the transport van, while completing the necessary paperwork." (Pls.' Resp. to Mot. for Summ. J., Ex. 4 at 6.)

The four complaints against Officer Gary for transportation

25

regulation violations, only one of which was sustained, even coupled with Officer Grigsby statement about holding defendants in a squad car, do not amount to a history of abuse sufficient to put the City on notice that the training in this particular area was deficient.  Thus, the Uhurus have failed to establish that the City had a policy, custom, or practice of inadequate training.

    3.  <u>Failure to Supervise</u>

According to the City, the Uhurus also allege that the City's failure to adequately supervise the Strike Team officers caused their constitutional deprivations. "A municipality may be held liable when its failure to supervise its police officers reflects a policy of deliberate indifference to the arrestee's constitutional rights." *Johnson v. City of Memphis*, 2008 U.S. Dist. LEXIS 1199, at *19 (W.D. Tenn. Jan. 8, 2008)(quoting *Bd. Of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 411 (1997)).

> To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.

*Id.* (citing *Vann v. City of New York*, 72 F.3d 1040, 1049 (2nd Cir. 1995)).

As previously stated, the court finds no allegations of failure to supervise in the Uhurus' complaint.  Nevertheless, to

the extent the complaint can be interpreted as such, the court finds the allegations to be without merit. The facts are undisputed that two lieutenants supervised the Strike Team and that two deputy chiefs supervised the two lieutenants. It is further undisputed that no complaints of excessive force were received against a member of the Strike Team while the officer was on the Strike Team. Each complaint previously mentioned against Officer Gray concerning transportation issues was thoroughly investigated by the ISB. Thus, the court cannot find that the City was deliberately indifferent to complaints involving transportation issues. Accordingly, the City's motion for summary judgment on the Uhurus' claim for violation of the Fourth Amendment based on failure to supervise is granted.

4.   <u>Failure to Investigate and Discipline</u>

Finally, the Uhurus claim that the City's failure to investigate and discipline the officers involved in the underlying incident caused their injuries. The Sixth Circuit has held that "[a] municipality's failure to adequately investigate constitutional violations committed by its employees and punish the responsible parties can establish municipal liability." *Johnson v. City of Memphis*, 2008 U.S. Dist. LEXIS 1199, at *11 (citing *Marchese v. Lucas*, 758 F.2d 181, 188-89 (6th Cir. 1985)).

In their reply, the City argues that the Uhurus have effectively abandoned this theory of liability and conceded to

27

summary judgment on this issue by failing to address the issue in its response.  A review of the Uhurus' response reveals that the City is correct in its assertion that the Uhurus do not address this issue at all, much less refute the City's argument that they are entitled to summary judgment on the Uhurus' allegation that their Fourth Amendment rights were violated by the City's failure to adequately investigate and discipline.  Although it appears, therefore, that the Uhurus have abandoned this theory of liability, the Court will nevertheless still determine whether the City if entitled to summary judgment on the issue as a matter of law.

The undisputed facts demonstrate that the City adequately investigates and disciplines members of the Strike Team.  The MPD has a policy regarding investigating complaints about the behavior of MPD officers.  The ISB reviews and investigates citizen complaints.  If the ISB finds a violation, it drafts charges and refers the matter to the Police Administration for discipline.

The ISB investigated the Uhurus' complaints against Lt. McCord and Officers Gray and Grisby.  Sgt. Sharon Mabon led the investigation.  As part of the investigation, the ISB took statements from twenty-one individuals.  The ISB sustained allegations of excessive force, truthfulness, and failure to follow procedures against Officers Gray and Grisby.  The ISB sustained allegations of personal conduct, compliance with regulations regarding radio procedures, and neglect of duty against Lt. McCord.

28

All received discipline.  Thus, the undisputed evidence shows that the MPD investigated and disciplined the officers involved in the underlying incident.

Moreover, the undisputed facts show that the City investigated complaints against Strike Team officers prior to the incident in question.  There were no complaints of excessive force against a member of the Strike Team prior to May 30, 2007.  The 1995 complaint against Lt. McCord was investigated, and he was disciplined.  The five allegations against Officer Gray for failing to comply with regulations were investigated; four were not sustained.  The complaint of excessive force on the part of Officer Grigsby, which allegedly occurred on January 20, 2005, was investigated but not sustained.

The Uhurus have failed to come forward with any evidence that the MPD failed to adequately investigate and discipline members of the Strike Team.  Accordingly, the City's motion for summary judgment on the Uhurus' Fourth Amendment claim based on the City's failure to investigate and discipline is granted.

CONCLUSION

For the foregoing reasons, the City's motion for summary judgment is GRANTED.

IT IS SO ORDERED this 6th day of October, 2009.

 s/ Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE