IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

SEFU AND AZABASHA UHURU,                )
                                        )
        Plaintiffs,                     )
                                        )
vs.                                     )        No. 08-2150-V
                                        )
                                        )
CITY OF MEMPHIS; MICHAEL MCCORD,)
individually and in his official)
capacity as a Memphis Police            )
Department Officer; STEVEN              )
GRISBY, individually and in his )
official capacity as a Memphis  )
Police Department officer; and  )
WILLIAM GRAY, individually and  )
in his official capacity as a   )
Memphis Police Department               )
Officer,                                )
                                        )
        Defendants.                     )

_____

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT OFFICERS'
MOTION FOR SUMMARY JUDGMENT

_____

        This is a civil rights action alleging deprivation of rights

pursuant to 42 U.S.C. § 1983.  In their complaint, the plaintiffs,

Sefu and Azabasha Uhuru (the "Uhurus"), allege that the defendants,

Lieutenant Michael McCord, Officer Billy Gray and Officer Steven

Grigsby (collectively "the officers") violated their rights under

the Fourth Amendment.[1]  The parties have consented to the

_____

        [1]   Although the Uhurus alleged in their complaint that the
City violated their rights under the Eighth and Fourteenth
Amendments, the court found that the complaint failed to stated a
claim under the Eighth and Fourteenth but sufficiently stated a
claim under the Fourth Amendment.  (Doc. No. 32, Order on Defs.'

jurisdiction of the United States Magistrate Judge, including entry of judgment, pursuant to 28 U.S.C. § 636(c). Now before the court is the officers' motion for summary judgment. The Uhurus filed a response in opposition to the motion. For the reasons stated below, the motion is DENIED in part and GRANTED in part.

## I.  THE ALLEGATIONS IN THE COMPLAINT

The complaint alleges that on May 30, 2007, Officers Gray and Grigsby arrived at the Uhurus' beauty salon in Memphis, Tennessee where they were verbally and physically abusive to two men waiting to go with the Uhurus to a play rehearsal. (Compl. ¶¶ 8-12.) It further alleges that after Mr. Uhuru tried to explain the situation, Officer Grigsby attacked him from behind, with Officer Gray later joining in, and that Officer Gray pepper-sprayed the Uhurus, punched them, and ripped out fourteen braids of Mrs. Uhuru's hair. (Compl. ¶¶ 14, 15, 17-19.) According to the complaint, when Lt. McCord arrived on the scene, he purportedly began to use racial slurs and threats and ordered the Uhurus be arrested. (Compl. ¶¶ 20-21.) The complaint further states that the Uhurus were detained in the backseat of a squad car for approximately two and one half hours, that Mr. Uhuru was transported to the Shelby County Jail, booked and processed, and Mrs. Uhuru was transported to Jail East, then to a medical

---

Rule 12(b)(6) Mot. to Dismiss at 14-15.) Thus, only the Fourth Amendment claim remains at issue in the case. (*Id.* at 34-35.)

facility, released, and cited for a misdemeanor.  (Compl. ¶¶ 21-23.)  The Uhurus' complaint states that any and all criminal charges against them have been dismissed.  (Compl. ¶ 26.)  The Uhurus claim that they sustained significant physical and mental anguish, pain, and suffering, and they seek both compensatory and punitive damages.

II. UNDISPUTED FACTS

A.   <u>The Initial Investigation</u>

On May 30, 2007, Officers Gray and Grigsby were members of a uniformed task force known as the "strike team," which was charged with patrolling high crime areas within the city of Memphis, Tennessee.  (Doc. No. 45-2, Defs.' Undisputed Facts ¶ 1; Doc. No. 51, Pls.' Resp. to Defs.' Undisputed Facts ¶ 1.)  The officers were assigned to patrol the area of Elvis Presley Boulevard and South Parkway where a shooting or homicide had recently occurred. (Defs.' Undisputed Facts ¶ 2, fn. 3, 4; Pls.' Resp. to Defs.' Undisputed Facts ¶ 2.)  Sometime between 7:00 and 7:15 p.m. that evening, the officers decided to investigate a vehicle that was backed into a parking space in front of Mrs. Uhuru's beauty salon located at 1391 Elvis Presley Boulevard.[2]  (Defs.' Undisputed Facts ¶ 3; Pls.' Resp. to Defs.' Undisputed Facts ¶ 3.)

---

[2]    The parties disagree as to whether the officers decision was racially motivated.  The resolution of this issue, however, is not relevant to the Uhurus' § 1983 action and therefore is not a material fact the dispute of which would preclude summary judgment here.

The officers parked their police cruiser beside the vehicle, exited their cruiser, checked the vehicle's license plate and began to question its two male occupants. (Defs.' Undisputed Facts ¶¶ 7-10; Pls.' Resp. to Defs.' Undisputed Facts ¶¶ 7, 10.)  The two occupants were later identified as J'malo White ("White") and Todario Harris ("Harris"). (Compl. ¶ 9; Defs.' Undisputed Facts ¶ 4; Pls.' Resp. to Defs.' Undisputed Facts ¶ 4.)  As the officers approached the vehicle, both observed a long machete lying in the middle of the rear seat with the handle pointing forward toward White and Harris. (Defs.' Undisputed Facts ¶ 11; Pls.' Resp. to Defs.' Undisputed Facts ¶ 11.)  The officers questioned both men and asked them to exit the vehicle whereupon it was discovered that White was in possession of a handgun. (Defs.' Undisputed Facts ¶¶ 12-14; Pls.' Resp. to Defs.' Undisputed Facts ¶¶ 12-14.)  Officer Gray obtained the firearm from White, placed him under arrest, conducted a pat-down search, and placed him in the back of the officers' squad car.[3]  (Defs.' Undisputed Facts ¶¶ 15-16, 18.)  While Officer Gray dealt with White, Officer Grigsby acted as the "cover" officer and stood at the rear of the vehicle near Harris. (Defs.' Undisputed Facts ¶ 19; Pls.' Resp. to Defs.' Undisputed

---

[3]     The Uhurus' version of these events differ markedly. (Pls.' Resp. to Defs.' Undisputed Facts ¶¶ 12-14.)  These differences, however, are irrelevant to the Uhurus' claims of excessive force under the Fourth Amendment. It is sufficient to note, for the purposes of ruling on the officers' present summary judgment motion, that the officers were in the process of arresting two armed individuals.

4

Facts ¶ 19.)   Neither party can agree as to the details of what occurred immediately thereafter.

B.   The Officers' Version of the Uhurus' Arrest

The officers contend that while Officer Gray was in the process of placing White in the back of the squad car, Mr. Uhuru approached Officer Grigsby from behind and began screaming at him. (Defs.' Undisputed Facts ¶¶ 19-20; Officer Gray Dep. 45:5-6.) Officer Gray became concerned for Officer Grigsby's safety because Mr. Uhuru's presence created a "two-on-one situation." (Defs.' Undisputed Facts ¶ 21.)   A brief exchange occurred between Mr. Uhuru and Officer Grigsby, during which Officer Grigsby told Mr. Uhuru to mind his own business and ordered him to go into his store. (*Id*. ¶¶ 22-25.)   Mr. Uhuru refused to comply because the officers were at his place of business. (*Id*. ¶ 26.)   Officer Grigsby repeatedly asked Mr. Uhuru not to step into the situation, to no avail. (*Id*. ¶ 27.)

Mr. Uhuru's refusal to comply with police orders caused the tension to escalate by preventing Officer Grigsby from giving cover to Officer Gray. (*Id*. ¶¶ 29-30.)   Accordingly, Officer Grigsby made the decision to detain Mr. Uhuru for disorderly conduct. (*Id*. ¶ 31.)   Mr. Uhuru resisted Officer Grigsby's attempts to handcuff him and a struggle ensued. (*Id*. ¶¶ 32-33.)   Mr. Uhuru was able to avoid being handcuffed and retreated into his business. (*Id*. ¶ 34.)   Because Officer Grigsby was unable to take Mr. Uhuru into

5

custody by himself, Officer Grigsby positioned himself on the threshold of the front door to the Uhurus' business and radioed for help. (*Id.* ¶ 35.) Officer Grigsby also asked Gray come to his aid. (*Id.* ¶ 36.) Together, Officers Gray and Grigsby re-entered the store and walked toward Mr. Uhuru, who was in the back corner of the store, speaking very loudly into his cell phone.[4] (*Id.* ¶¶ 37-38.) As Officer Grigsby approached, Mr. Uhuru pushed the officer back, despite both officers' instructions not to resist arrest. (*Id.* ¶¶ 39, 43.) Mr. Uhuru also refused the officers' requests to place his hands behind his back, causing a second struggle that lasted for a few seconds. (*Id.* ¶ 44.) After Mr. Uhuru shoved both officers backward, Officer Gray used his pepper spray on Mr. Uhuru, inadvertently hitting Officer Grigsby with the same blast. (*Id.* ¶¶ 46-47.) Mrs. Uhuru subsequently attacked Officer Gray by choking him from behind. (*Id.* ¶ 48.) In defense, Officer Gray threw Mrs. Uhuru off of him and administered pepper spray. (*Id.* ¶ 50.) Despite this altercation, Mrs. Uhuru was able to walk out of the store, where she was handcuffed and placed into the squad car of another officer. (*Id.* ¶¶ 54-55.) The officers contend that the audio recording from Mr. Uhuru's 911 emergency

---

[4]    Neither party disputes, for the purposes of this summary judgment motion, that Mr. Uhuru was speaking to 911 dispatch, which was recorded. (Defs.' Undisputed Facts ¶ 40; Pls.' Resp. to Defs.' Undisputed Facts ¶ 40.) The officers can also be heard on this tape. (Defs.' Undisputed Facts ¶ 41; Pls.' Resp. to Defs.' Undisputed Facts ¶ 41.)

call corroborates their depiction of the struggle. (Doc. 45-3, Defs.' Summ. J. Mem. 6; Sharon Mabon Dep. 48:3-8, Ex. 3.)

C.    <u>The Uhurus' Version of Their Arrest</u>

Mr. Uhuru argues that as he approached the officers arresting White and Harris in front of his store, he asked Harris "What's going on?" (Doc. 50, Pls.' Resp. Mem. 2; Sefu Uhuru Dep. 72:5-9.) Officer Grigsby replied "don't you walk your black ass up behind me." (Pls.' Resp. Mem. 2; Sefu Uhuru Dep. 72:13-16.) Mr. Uhuru denies ever being behind or coming within than ten feet of Officer Grigsby. (Pls.' Resp. to Defs.' Undisputed Facts ¶ 20.) Officer Grigsby then told Mr. Uhuru to "mind his own business" and ordered him to go into his store. (Pls.' Resp. to Defs.' Undisputed Facts ¶¶ 23, 25-26.) Mr. Uhuru admits that he did not immediately comply with Officer Grigsby's request, but instead asked again what was happening, this time adding that he wanted to know because they were in front of his business and Harris and White were his friends. (Pls.' Resp. to Defs.' Undisputed Facts ¶ 27; Sefu Uhuru Dep. 73:22-74:5.) Officer Grigsby then threatened to take Mr. Uhuru to jail if he did not go back into his business, at which point Mr. Uhuru ceased his discussion with Officer Grigsby and turned to unlock the door to his building. (Pls.' Resp. to Defs.' Undisputed Facts ¶¶ 27-28; Sefu Uhuru Dep. 73:22-74:9.)

Mr. Uhuru was almost two full steps into his store before Officer Grigsby first attempted to handcuff him. (Pls.' Resp. to

Defs.' Undisputed Facts ¶ 33.)  Officer Grigsby attacked Mr. Uhuru
from behind, reaching for Mr. Uhuru's throat with one hand and
attempting to handcuff him with the other, all while saying "come
here, come here, come here."  (Pls.' Resp. Mem. 3; Pls.' Resp. to
Defs.' Undisputed Facts ¶ 33.)  The attack startled Mr. Uhuru, who
put his hands up to protect his throat.[5]  (Pls.' Resp. to Defs.'
Undisputed Facts ¶ 33; Sefu Uhuru Dep. 76:12-17.)  Officer Grigsby
never informed Mr. Uhuru that he was under arrest, that he was
going to jail, or directed him to stop resisting arrest.  (Pls.'
Resp. to Defs.' Undisputed Facts ¶ 39.)  Fearful for his life, Mr.
Uhuru stated out loud "What's going on?"  (Pls.' Resp. Mem. 3.)
Mr. Uhuru then retreated to the back of his store, knocking over
items as he went, while Officer Grigsby continued slapping the
handcuffs at Mr. Uhuru's arm in a chopping motion with one hand and
reaching at Mr. Uhuru's neck with the other.  (Pls.' Resp. Mem. 3;
Sefu Uhuru Dep. 81:10-17.)  Officer Grigsby then suddenly stopped
advancing, told Mr. Uhuru that "he would be back for [his] black
ass," and walked out the front door.  (Pls.' Resp. to Defs.'
Undisputed Facts ¶ 35.)

According to Mrs. Uhuru, upon exiting the store, Officer
Grigsby approached Officer Gray and asked if he had his taser gun
and pepper spray.  (Pls.' Resp. to Defs.' Undisputed Facts ¶ 35;

---

[5]     Mr. Uhuru denies swatting at Officer Grigsby's arm at any
time during the scuffle.  (Pls.' Resp. to Defs.' Undisputed Facts
¶ 39; Sefu Uhuru Dep. 137:1-11.)

Azabasha Uhuru Dep. 36:6-7.)  Mrs. Uhuru pleaded with the officers to explain why they were attacking her husband, but they ignored her.  (Pls.' Resp. to Defs.' Undisputed Facts ¶ 35; Azabasha Uhuru Dep. 36:11-16.)  Both officers then re-entered the building and rushed toward Mr. Uhuru, who was on his cell phone at the back of the store.[6]  (Pls.' Resp. to Defs.' Undisputed Facts ¶ 35; Azabasha Uhuru Dep. 38:12-19.)  As they approached, the officers said, "[I'm] going to get your black ass, come on, come on, what are you doing."  (Pls.' Resp. to Defs.' Undisputed Facts ¶ 37; Sefu Uhuru Dep. 82:19-21; Azabasha Uhuru Dep. 38:22-24.)  Again, the officers failed to inform him that they were trying to place him under arrest.  (Pls.' Resp. to Defs.' Undisputed Facts ¶ 39.)  Mr. Uhuru claims that when the officers reached him at the back of the store, Officer Grigsby again attempted to choke him.  (Pls.' Resp. to Defs.' Undisputed Facts ¶ 39.)

According to Mrs. Uhuru, by this point in the struggle, the officers appeared to be attacking her husband rather than attempting to arrest or handcuff him.  (Azabasha Uhuru Dep. 40:15-41:3.)  Mr. Uhuru then noticed Officer Gray pull out his pepper spray.  (Pls.' Resp. Mem. 4.)  Mr. Uhuru stated, "Man, I am an asthmatic, don't spray me with that, that could possibly kill me or send me to the hospital," to which Officer Gray replied, "I don't

---

[6]      Mr. Uhuru was on the phone with the 911 dispatch operator, as discussed, *supra* note 4.

give a fuck." (Sefu Uhuru Dep. 83:1-8.) Officer Gray then sprayed
Mr. Uhuru. (Pls.' Resp. Mem. 4.) Seeing this, Ms. Uhuru begged
the officers to stop, throwing her body in front of the stream of
pepper spray to prevent any more of it from hitting her husband.
(Pls.' Resp. to Defs.' Undisputed Facts ¶ 48.) Coming in contact
with the pepper spray caused Mrs. Uhuru to immediately fall to the
floor in the fetal position. (*Id.*) Officer Gray then grabbed a
handful of Mrs. Uhuru's hair, ripped it from her head, and punched
her as she lay on the floor. (*Id.*; Azabasha Uhuru Dep. 44:23.)
Mr. Uhuru was finally handcuffed after both he and his wife were
pepper sprayed. (Pls.' Resp. Mem. 5; Sefu Uhuru Dep. 83:22-24.)
After being placed in handcuffs, Officer Gray punched him in the
head, knocking him off balance. (Pls.' Resp. Mem. 5; Sefu Uhuru
Dep. 83:24-84:1.)

    Mr. Uhuru denies that his actions caused the situation to
escalate. (Pls.' Resp. to Defs.' Undisputed Facts ¶ 28.) Mr.
Uhuru contends that he used no racial epithets nor foul language
during his initial exchange with Officer Grigsby. (Sefu Uruhu Dep.
136:19-24.) Officer Grigsby made statements such as "[D]on't walk
your black ass up behind me," and "[I]f you say another word I'm
taking your black ass to jail." (*Id.* 74:1-7.) During the entire
struggle, Mr. Uhuru denies exerting any aggression toward the
officers. (Sefu Uhuru Dep. 137:4-11.) In addition, Mrs. Uhuru

denies ever touching either officer. (Azabasha Uhuru Dep. 44:17-19.)

D.   The Aftermath

After being pepper sprayed, the parties agree that Mrs. Uhuru walked out of the store, though the Uhurus contend that she was able to do so only with help from her daughter. (Defs.' Undisputed Facts ¶ 54; Pls.' Resp. to Defs.' Undisputed Facts ¶ 54.) Newly arrived officers placed the Uhurus in separate squad cars, and the officers charged them with various offenses including assault, disorderly conduct and resisting arrest. (Defs.' Undisputed Facts ¶¶ 55-58; Pls.' Resp. to Defs.' Undisputed Facts ¶¶ 55-58.) The officers also took photographs of injuries suffered by Officer Gray during the struggle. (Defs.' Undisputed Facts ¶ 53; Pls.' Resp. to Defs.' Undisputed Facts ¶ 53.)

Both parties agree that Lt. McCord was not on the scene during the struggle but arrived shortly after the Uhuru's were detained. (Defs.' Undisputed Facts ¶¶ 59-60; Pls.' Resp. to Defs.' Undisputed Facts ¶¶ 59-60.) Lt. McCord spoke with the officers on the scene as well as the Uhurus in an attempt to deduce the facts of what had taken place. (Defs.' Undisputed Facts ¶¶ 61-62, 64; Pls.' Resp. to Defs.' Undisputed Facts ¶¶ 61-62, 64.) While he spoke with Mr. Uhuru, Lt. McCord changed Mr. Uhuru's handcuffs, poured water on Mr. Uhuru's face to remove some of the pepper spray, and allowed

him to exit the squad briefly.  (Defs.' Undisputed Facts ¶ 64; Pls.' Resp. to Defs.' Undisputed Facts ¶ 64.)

Mr. Uhuru contends that Lt. McCord initially opened the door of the police cruiser in which Mr. Uhuru was seated and asked, "[W]hat the fuck is wrong with you for interfering with police business?" (Pls.' Resp. Mem. 5; Sefu Uhuru Dep. 86:3-6.)  Mr. Uhuru replied, "I don't want to have an argument or exchange with you about anything like this," and Lt. McCord closed the squad car door.  (Pls.' Resp. Mem. 5; Sefu Uhuru Dep. 86:6-8.)  Lt. McCord later informed Mr. Uhuru that he was a third generation police officer, and an ex-marine.  (Sefu Uhuru Dep. 87:5-11.)  Lt. McCord identified the officers as members of the "strike team" and made clear to Mr. Uhuru that the only thing he cared about was his men. (*Id.*)

Mr. Uhuru also contends that he overheard Lt. McCord make disparaging racial comments.  Lt. McCord referred to the people who live in the predominately black area where Mr. Uhuru's business was located as "dogs" and "wild dogs." (*Id.* 105:1-5.)  Lt. McCord also stated, "Usually I'm locking up niggers; tonight I got a chance to lock up some white folks," though Mr. Uhuru does not know to what Lt. McCord was referring.  (*Id.* 102:13-17.)  Both Mr. and Mrs. Uhuru contend that Lt. McCord referred to Mr. Uhuru's daughter as a "black bitch" and threatened to "take her ass to jail." (*Id.* 104:11-18; Azabasha Uhuru Dep. 58:14-23.)

12

Shortly after Lt. McCord arrived on the scene, a crowd began to form. (Defs.' Undisputed Facts ¶ 70.) The officers contend that number of onlookers made the situation very unsafe for them to remain there. (*Id.*) Upon the suggestion of Officer Grigsby, the officers decided to relocated to nearby Hamilton High School, and an unspecified officer on the scene notified dispatch of the change in location. (*Id.* ¶¶ 71-73.) The Uhurus contend that Hamilton High School is a well-known site where police officers abuse black citizens. (Pls.' Resp. to Defs.' Undisputed Facts ¶ 70.) The Uhurus contend that they were detained at Hamilton High School for over three hours for the purpose of being abused. (*Id.* ¶ 78.) Other than their characterization of Hamilton High School as a notorious location within the black community, the Uhurus make no specific allegations that they suffered any physical or verbal attacks while there. Rather, the Uhurus claim that Lt. McCord told Mrs. Uhuru that "she was not going to get off that easy," and that he would file a felony warrant against her the following week. (Pls.' Resp. Mem. 6; Azabasha Uhuru Dep. Part II 24:7-16.)

While at Hamilton High, the officers began filling out paper working using an electronic handheld device known as a PDA. (Defs.' Undisputed Facts ¶ 77.) The PDA which Officer Gray was using subsequently froze, forcing him to re-start the paperwork from scratch on a new device. (*Id.* ¶ 78.) At approximately 9:50 p.m., just over one and a half hours after leaving the Uhuru's

store for Hamilton High, Lt. McCord then instructed the officers to transport the Uhurus and Mr. White to 201 Poplar. (*Id.* ¶¶ 79-80.) Officer Gray submitted his report at 11:25 p.m., which the officers contend that the report was submitted after they arrived. (*Id.* ¶ 82-83.) Mr. Uhuru contends that he did not arrive at 201 Poplar until around midnight. (Pls.' Resp. to Defs.' Undisputed Facts ¶ 80; Sefu Uhuru Dep. 109:14-110:12.) Mr. Uhuru stated in his deposition, however, that he was kept in the back of the squad car for only two hours. (Sefu Uhuru Dep. 87:20-22.) Mr. Uhuru was released from 201 Poplar the following morning. (Defs.' Undisputed Facts ¶ 86; Pls.' Resp. to Defs.' Undisputed Facts ¶ 86.)

The officers initially transported Mrs. Uhuru to Jail East which would not accept her because she had been sprayed with a chemical agent. (Defs.' Undisputed Facts ¶ 84; Pls.' Resp. to Defs.' Undisputed Facts ¶ 84.) The officers then transported her to a hospital, which refused to accept her because she could not confirm that she was not pregnant. (Defs.' Undisputed Facts ¶ 85; Pls.' Resp. to Defs.' Undisputed Facts ¶ 85.) The officers claim they returned Mrs. Uhuru to her home at approximately 12:25 a.m., though Mrs. Uhuru claims she did not return home until between 3:00 and 4:00 a.m. (Defs.' Undisputed Facts ¶ 87; Pls.' Resp. to Defs.' Undisputed Facts ¶ 87; Azabasha Uhuru Dep. Part II 39:17-19.)

All charges against the Uhurus were eventually dismissed. (Defs.' Undisputed Facts ¶ 89; Pls.' Resp. to Defs.' Undisputed

Facts ¶ 89; Sefu Uhuru Dep. 111:2-4.)   On March 4, 2008, the Uhuru's filed a complaint asserting that Officers Gray and Grigsby, and Lt. McCord, among others, had violated their constitutional rights under the Fourth Amendment.[7]   On June 26, 2009, the three co-defendants moved for summary judgment asserting the defense of qualified immunity.[8]   (Doc. 45, Defs.' Mot. for Summ. J. 1-2.)

III.   ANALYSIS

A.   Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   FED. R. CIV. P. 56(c); *see also LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental*

---

[7]   The complaint also listed as defendants: (1) the city of Memphis, (2) the Memphis Police Department, (3) Larry Godwin, Director of Memphis Police, individually and in his official capacity, and (4) Officers Gray and Grigsby, and Lt. McCord as individuals.   (Compl. ¶¶ 3-7.)   This court entered an order on October 17, 2008, dismissing the suit against the Memphis Police Department, Director Godwin individually and in his official capacity, and Officers Gray and Grigsby, and Lt. McCord individually. (Doc. 32, Order on Defs.' Rule 12(b)(6) Mots. to Dismiss 2.)

[8]   The City of Memphis also moved for summary judgment by a separate motion.   (Doc. 44, Def. City of Memphis' Mot. for Summ. J.)

*Health Servs.*, 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact at issue in the case. *LaPointe,* 8 F.3d at 378. This may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

In response, the nonmoving party must go beyond the pleadings and present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *see also LaPointe*, 8 F.3d at 378. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247—48 (1986)(emphasis in original); *LaPointe*, 8 F.3d at 378.

In deciding a motion for summary judgment, "this [c]ourt must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251—52). The evidence, all facts, and any inferences that may

16

permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Patton*, 8 F.3d at 346; *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). However, to defeat a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252; *LaPointe*, 8 F.3d at 378. Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Anderson*, 477 U.S. at 255; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

B.   <u>Qualified Immunity</u>

The United States Supreme Court articulated the doctrine of qualified immunity for government officials in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). In *Harlow*, the Court stated:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow*, 457 U.S. at 818. "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514

17

(1994) (quoting *Harlow*, 457 U.S. at 806).  Implicit in the qualified immunity doctrine is a recognition that police officers, acting reasonably, may err.  *Scheuer v. Rhodes*, 416 U.S. 232, 242 (1974).  In applying the doctrine, courts acknowledge that "it is better to risk some error and possible injury from such error than not to decide or act at all."  *Id.*

Unlike other affirmative defenses, qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchel v. Forsyth*, 472 U.S. 511, 526 (1985).  Thus, the defense is effectively lost if a case is erroneously permitted to go to trial. *Id*.  Courts are therefore guided to resolve questions involving qualified immunity at the earliest possible stage of litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

The qualified immunity analysis requires the court to determine whether, when viewing the facts in the light most favorable to the plaintiff: (1) the defendant's actions violated a constitutional right; and (2) the constitutional right at issue "was clearly established at the time of defendant's alleged misconduct".[9]  *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009)

---

[9]    Some disagreement exists within the Sixth Circuit as to whether a proper analysis of qualified immunity cases involving claims of excessive force requires a two or three part test. *Compare Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)(applying a third step in which the court must assess whether the official's conduct was objectively unreasonable in light of the clearly established constitutional right), *and Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005) (explaining that the *Feathers* three-pronged analysis is wholly consistent with Supreme Court

(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).[10]  "The burden

is on the plaintiff to allege and prove that the defendant official

violated a clearly established constitutional right." *Buckner v.*

*Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994).  Furthermore, the right

the official is alleged to have violated must have been "clearly

established" in a more particularized sense, not just a general,

abstract right. *Anderson v. Creighten*, 483 U.S. 635, 639 (1987).

"The contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates

---

precedent), *with Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir 2004)(criticizing the addition of the third prong in light of the rigid framework announced by the Supreme Court in *Saucier*), *and Grawey*, 567 F.3d at 309 (finding the addition of a third step of analysis redundant in excessive force cases "because the defendant's conduct must have been objectively unreasonable to find a constitutional violation").

    Despite the differing approaches, a thorough reading of the cases reveals very little difference in the resulting anaylses. Moreover, the Supreme Court recently granted lower courts the discretion to make qualified immunity determinations in the manner "most appropriate to the case before them," *See Grawey*, 567 F.3d at 309 (citing *Pearson v. Callahan*, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565, 576 (2009)).  In light of the focus which the Supreme Court placed on the efficient use of judicial resources in *Pearson*, the court chooses to exercise its discretion to conduct the qualified immunity analysis according to the two-step approach preferred by the Supreme Court. *See Pearson,* 129 S. Ct. at 818, 172 L. Ed. 2d at 576 (finding that while the *Saucier* approach is no longer mandatory, it is often appropriate).

    [10]  As noted in *Grawey*, the Supreme Court recently granted lower courts the discretion to decide for themselves the sequence in which to conduct their analysis of qualified immunity cases. *Id.*, 567 F.3d at 309 (citing *Pearson v.* 129 S. Ct. at 818, 172 L. Ed. 2d at 576).  While the court commented that the *Saucier* sequence was often appropriate, lower courts are free to decide for themselves "in light of the circumstances of the particular case at hand."

that right." *Id.* at 640.  "Although it need not be the case that 'the very action in question has been previously held unlawful, . . . in the light of the pre-existing law the unlawfulness must be apparent.'" *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Creighten*, 483 U.S. at 640).  "Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)(citing *Buckner*, 36 F.3d at 540).

C.   <u>Excessive Force - - Officers Gray and Grigsby</u>

First, the court must determine whether the actions of either Officers Gray or Grigsby violated a constitutional right.  The Uhurus argue that the officers' actions violated their rights under the Fourth Amendment.[11]  Specifically, the Uhurus claim that the officers used excessive force while attempting to arrest them as well as after each was subdued.  (Compl. ¶¶ 57, 62.)  The Uhurus do not argue that the officers arrested either of them without probable cause, but focus solely on whether the force the officers used was excessive under the circumstances.  (Pls.' Resp. Mem. 8.)

---

[11]    In their response to the officers' summary judgment motion, the Uhurus refer to the officers' arrest of White and Harris as "unlawful."  (Pls. Resp. Mem. 9.)  As the officers correctly point out in their reply memorandum, the Uhurus lack standing to challenge that particular action, plus it is irrelevant to their pending motion for summary judgment.  Therefore, the court will not address the issue.

Claims of excessive force by a government official require the "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). The objective reasonableness of official's conduct "depends on the facts and circumstances of each case viewed from the prospective of a reasonable officer on the scene and not with 20/20 hindsight." *Dunn v. Matahall*, 549 F.3d 348, 353 (6th Cir. 2008) (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)). Given this standard, an officer who, during the heat of the moment, mistakenly used an amount of force which was later proved unneeded, would not have used "excessive force" in the context of the Fourth Amendment. *Saucier*, 533 U.S. at 205. Despite this somewhat limited ability to scrutinize officials' actions due to the "fast-paced and uncertain environment" in which they operate, courts should not reflexively rubber-stamp every use of force by police officers. *Dunigan*, 390 F.3d at 497 (Moore, J., dissenting). The governmental interest in any situation justifies only the amount of force that the prudent officer would believe was necessary to effectuate the arrest, and no more. *Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006).

Ultimately, the court must weigh the totality of the circumstances "without regard to [the officer's] underlying intent or motivation." *Vaughn v. City of Lebanon*, 18 F. App'x 252, 265

(quoting *Graham*, 490 U.S. at 396).   Because of the particularly fact-based nature of the determination, many cases will require that a jury make credibility determinations among witnesses to fully assess whether the officer's use of force was proper. *Vaughn*, 18 F. App'x at 266.   Summary judgment is improper if "the legal question of immunity" depends entirely upon which version of the facts the jury chooses to accept. *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989).

Second, the court must determine whether the constitutional right violated by the officers was clearly established at the time of the alleged misconduct. *Grawey*, 567 F.3d at 313.   In *Grawey*, the Sixth Circuit set forth the relevant inquiry to determine whether the official was on notice that his conduct was illegal:

> An action's unlawfulness can be apparent from direct holdings, specific examples described as prohibited, or from the general reasoning [employed by other courts]. In an obvious case, general standards can clearly establish the answer, even without a body of relevant case law. There need not be a case with the exact same fact pattern or even fundamentally similar of materially similar facts: rather, the question is whether the defendants had fair warning that their actions were unconstitutional.  Thus, officials can still be on notice that their conduct violates established law even in novel factual circumstances.

*Id.* 567 F.3d at 313-14 (internal citations and quotations omitted). Regardless of this flexibility, it remains true that the unlawfulness of an action must have been reasonably apparent to the reasonable official. *Creighton*, 483 U.S. at 640.

The facts alleged by the Uhurus raise three separate events that may constitute the use of excessive force: (1) the amount of force used in attempting to arrest Mr. Uhuru; (2) the decision to use pepper spray; and (3) the act of punching the Uhuru's after they were subdued.   Accordingly, the court will address each individually.

1.   Officer Grigsby's Use of Force Against Mr. Uhuru

An officer's use of force against an individual who is attempting to comply with the officer's orders may constitute an excessive use of force, depending on the circumstances. *See Sample v. Bailey*, 409 F.3d at 689 (finding excessive force where the plaintiff was shot by an officer while attempting to exit, at the officer's command, a cabinet in which he had been hiding).   Where an individual's infraction can be considered minor, an officer's use of force may be excessive even where an individual actively resists if the officer failed to inform that individual that he was under arrest. *See Atkins v. Twp. of Flint*, 94 F. App'x 342, 349 (6th Cir. 2004) (finding that where an officer failed to inform the plaintiff that he was under arrest for making a phony 911 call, a jury must determine whether the officer's use of force was reasonable); *accord Adams*, 31 F.3d at 385 (failing to inform an individual that he was being cited for a seatbelt violation).

The Uhurus' contentions raise a material issue of fact as to whether the officers used excessive force during their attempts to

23

apprehend the Uhurus.   If Mr. Uhuru's account is believed, a reasonable juror could find the officers' conduct to be in violation of Mr. Uhuru's Fourth Amendment rights.  Mr. Uhuru admits that he initially refused to comply with Officer Grigsby's commands to "mind his own business."  Mr. Uhuru contends, however, that once Officer Grigsby threatened him with arrest if he did not leave the situation immediately, he said nothing further and attempted to enter his store as commanded, only to have Officer Grigsby attack him from behind without further warning.

According to Mr. Uhuru, during the initial exchange, he used no foul language or racial epithets and did not raise his voice or make any threatening movements toward Officer Grigsby.  Despite the officers' contentions that Mr. Uhuru's initial refusal to disperse created a dangerous "two-on-one situation," a reasonable juror could find that once Mr. Uhuru complied with the officer's order to disperse, the potential for danger was averted.  This fact, coupled with the Uhurus' allegations that Officer Grigsby never informed Mr. Uhuru that he was under arrest, could support a reasonable juror's finding that the officers' ensuing assault of Mr. Uhuru was unreasonable.

As to the encounter inside the beauty salon, Mr. Uhuru contends that he did not resist arrest, nor assert any aggression

24

toward the officers at any time.[12]  Mr. Uhuru did admit to raising

his hands up on more than one occasion, but insists that both times

he was merely attempting to defend himself from being choked by

Officer Grigsby.   Mrs. Uhuru also denies ever touching the

---

[12]      The officers contend that the recording of Mr. Uhuru's
911 call clearly refutes the Uhuru's version of what occurred
inside the Uhuru's store. (Doc. 62, Def. Officers' Reply Mem. 3.)
Specifically, the officers argue that the transcript of the call
reveals that the officers did in fact instruct Mr. Uhuru that he
was under arrest and to stop resisting arrest, in direct
contradiction to Mr. Uhuru's deposition testimony. (*Id.*)  The
officers also submit that Mr. Uhuru's statement "I'm not letting
y'all take me" as seen in the tape transcripts reveals that Mr.
Uhuru did in fact resist arrest. (*Id.*)
     The court is aware of the case of *Scott v. Harris*, 550 U.S.
372, 378-81 (2007), in which the Supreme Court overturned an
Eleventh Circuit panel's decision to affirm the denial of the
defendant's motion for summary judgment based on the plaintiff's
version of the facts despite the existence of a video tape which
the court found to clearly contradict many of the plaintiff's
contentions.   *Id.* at 380 ("Far from being the cautious and
controlled driver the lower court depicts, what we see on the video
more closely resembles a Hollywood-style car chase . . . .").  The
transcript of the tape in this case, however, does not foreclose
the possibility that a juror might believe the Uhurus' contentions.
First, both parties agree that this transcript depicts only the
conversation heard during the *second* struggle alleged by Mr. Uhuru,
leaving the fact finder to determine what occurred during the first
altercation between Mr. Uhuru and Officer Grigsby.   Second, it is
not clear whether the transcript contains a complete account of the
struggle.   There is no time stamp on the transcript indicating how
long the call lasted, and neither party has provided the court with
one.  Moreover, multiple notations on the transcript indicate that
the transcriber was unable to understand what was being said.   In
light of these gaps, it is not proper for the court to deny either
party the ability to have a reasonable juror decide what actually
happened.    Finally, despite the officers' contentions to the
contrary, Mr. Uhuru's verbal refusal to be "taken" by the police
does not prove physical resistance on his part.   Nor does the
police officers' instruction not to "resist" create an irrebuttable
presumption that the officers had informed Mr. Uhuru that he was
under arrest.   It is for the jury to decide the context and the
meaning of the statements captured by the recording.

officers.  Despite the fact-intensive nature of the inquiry, a prudent officer would have known that the officers' actions, as described by the Uhurus, were unreasonable.  Essentially, the reasonable officer would know that it was proper to first inform an individual that he or she was under arrest before resorting to force, rather than commanding that person to vacate the premises and then attacking a citizen from behind as they walked away. Because the Uhurus' allegations amount to an excessive use of force in violation of their constitutional rights, and a reasonable officer would have known such conduct violated the Uhurus' rights under the Fourth Amendment, the court will allow a jury to decide whether their story is credible.

2.  The Officers' Use of Pepper Spray

The Sixth Circuit has noted that the use of pepper spray may be excessive force where the plaintiff was not actively resisting arrest, had not been informed he was under arrest, or could no longer be perceived as a threat to the officers or others.  *Grawey*, 576 F.3d at 310-11 (citing *Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007)).  The use of pepper spray may also constitute excessive force where an individual is guilty of only a minor violation if that individual was actively resisting arrest. *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002).  While the use of pepper spray may also be justified where an individual actively

resists arrest, it is up to the fact-finder to make this determination. *Vaughn*, 18 F. App'x at 268.

Here, the determination of whether the officers' use of pepper spray was unreasonable depends on the jury's perception of the circumstances in which it was applied. As stated above, the Uhurus deny resisting arrest. In addition, the Uhurus deny attacking either of the officers. Although Mr. Uhuru admits to pulling his arm away from Officer Grigsby as he attempted to slap Mr. Uhurus' arm with handcuffs, a reasonable juror could find excessive force exists in light of Mr. Uhuru's contention that he was never informed that he was under arrest. *See Atkins*, 94 F. App'x at 349; *Adams* 31 F.3d at 385.

The officers do not argue that either of the Uhurus were armed, and the Uhurus deny showing aggression toward the officers in any way. Essentially, the officers predicate their use of pepper spray on the fact that Mr. Uhuru resisted their lawful attempts to arrest him for failing to follow an order to disperse. But the Uhurus claim that they did not resist arrest. In fact, Mrs. Uhuru claims that she was already on the floor when she was pepper sprayed, thus severely discounting any attempt to characterize her as a flight risk. In addition, Mr. Uhuru claims to have verbalized to the officers that he was an asthmatic and asked the officers not to use pepper spray on him because it could kill him, and that Officer Gray sprayed him despite his plea.

Given that Mr. Uhuru's version of the events directly undercuts the officers' justification, a jury must decide whether the officers' use of pepper spray was unreasonable.  If the jury believes the Uhurus' story, a jury could find that the use of pepper spray on an asthmatic and non-resistant Mr. Uhuru as well as an incapacitated and non-resistant Mrs. Uhuru violates the Fourth Amendment.

Sixth Circuit precedent clearly establishes that the use of pepper spray on an incapacitated or non-resisting citizens *does* constitute excessive force. *Bultema v. Benzie County*, 146 F. App'x 28, 35 (6th Cir. 2005); *Champion v. Outlook Nashville*, 380 F.3d 893, 903-904 (6th Cir. 2004) *Vaughn*, 18 F. App'x at 252; *Adams*, 31 F.3d 386; *but see Howard v. Wayne County Sheriff's Office*, No. 08-13501, slip op., 2009 WL 2849135, at *7 (E.D. Mich. Sept. 1, 2009) (finding "the precise contours of the right to be free from the use of excessive force unclear" where some form of resistance exists). As noted above, a clearly established right may be evident not only from direct holdings of other cases, but also from "the general reasoning [employed by other courts]." Grawey*, 567 F.3d at 313-14. Thus, depending on the facts, the existence of a right may still be clearly established even under novel circumstances.  *Id*. at 314. Taking the facts in the light most favorable to the Uhurus, the court finds that their right not to be sprayed with a chemical agent was clearly established.  Thus, qualified immunity is improper.

3.   Punching the Uhurus After They Were Subdued

Finally, it is well settled in the Sixth Circuit that police officers may not use gratuitous violence after an individual has been subdued.  *Pigram v. Chaudoin*, 199 F. App'x at 513; *Phelps v. Coy*, 286 F.3d 295, 301-02.   Once an individual is handcuffed, the further use of force is unquestionably prohibited absent exigent circumstances.  *See McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)(finding unreasonable an officer's use of a nightstick on a suspect in handcuffs who was not resisting).   The Uhurus claim that Officer Gray punched both of them after they were handcuffed.  Taking this allegation as true, Officer Gray's actions clearly violated the Uhurus' constitutional rights.   Due to the fact that the law on this subject is well settled, qualified immunity is improper.

D.   Lt. McCord

The Uhurus agree that Lt. McCord took no part in the alleged actions of Officers Gray or Grigsby and was not on the scene until after the Uhurus had been arrested.   Thus, in order to find Lt. McCord liable for the actions of the other defendant officers, the Uhurus must show that he "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on."  *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)(citations omitted).   In the context of § 1983 actions, each official is liable only for his or her own misconduct.  *Ashcroft v. Iqbal*, 129

S. Ct. 1937, 1949, 173 L. Ed. 2d 868, 883 (2009).  The Uhurus may not simply rest on the theory of *respondeat superior* and escape Lt. McCord's defense of qualified immunity.  *Ashcroft*, 129 S. Ct. at 1948, 173 L. Ed. 2d at 882 (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978).  To overcome immunity, the Uhurus must show that Lt. McCord purposefully intended that Officers Gray and Grigsby violate their rights.  *See Ashcroft*, 129 S. Ct. at 1949, 173 L. Ed. 2d at 883.

Even when taking the facts in the light most favorable to the Uhurus and drawing all inferences in their favor, it is clear that Lt. McCord is entitled to qualified immunity.  The Uhurus allege that Lt. McCord used racial slurs in referring to the Uhurus as well as their daughter.  But to find a violation under the Fourth Amendment, there must first exist a search or seizure.  *See County of Sacarmento v. Lewis*, 523 U.S. 833, 844-45 (1998) (finding that in the absence of a seizure, an individual must pursue a substantive due process claim).  The use of racially insensitive language does not constitute a search or seizure and therefore does not amount to a constitutional violation.  *Johnson v. City of Ecorse*, 137 F. Supp. 2d 886, 892 (E.D. Mich. 2001); *Estate of Brouhard v. Village of Oxford*, 990 F. Supp. 839, 842 (E.D. Mich. 1997).

The Uhurus failed to show that Lt. McCord took part in seizing the Uhurus.  Nor did they provide any evidence by which a jury

30

could find that Lt. McCord violated the Uhurus' constitutional rights either personally or purposefully through a subordinate. Therefore, because the Uhurus have failed to overcome his defense of qualified immunity, summary judgment is proper as to Lt. McCord.

### III.  CONCLUSION

For the foregoing reasons, the officers' motion for summary judgment is DENIED as to Officers Gray and Grigsby and GRANTED as to Lt. McCord.

IT IS SO ORDERED this 6th day of October, 2009.


 s/ Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE